Good morning, Your Honor, and may it please the Court. My name is Richard Gaykin. I'm appearing here today on behalf of the appellants, and I've requested a reservation of five minutes for rebuttal. This case presents a straightforward question. Are the government's actions in fighting a forest fire subject to the same level of judicial scrutiny as the government's actions in letting a fire burn? This Court has never held that these two dramatically different actions are subject to the same level of scrutiny under the Federal Torah Claims Act. Well, it's all one statute, so the ultimate answer is, yes, they are subject to the same level of scrutiny. I mean, I don't find the question very illuminating. Well, the point is you — The question is particular facts of this case and how they relate. Pardon me, Your Honor. I mean, I understand it was a different decision, so therefore, we have to look at the decision that was at stake and decide whether it was within the discretionary exception. I mean, I don't think there's a generic rule either way. Well, the point here is that the district court found that the Miller decision governed the situation here, and that's a firefighting case. Governed it in what sense? It didn't govern it as to whether there was discretion, right? Because we were dealing with a very specific set of regulations here that deal with this particular decision. Correct. But the court basically found that any time the Forest Service is obliged to — is forced to fight a fire, then essentially all actions that follow that are discretionary, even if there's some mandatory language to the contrary. But here, you're correct, Your Honor, that there are different factual circumstances that come to bear, and we've identified two particular areas where the government failed to follow its mandatory duties. The first is that they failed to use a qualified fire use management team. And in this — the mandatory procedures that govern fire management allow the Forest Service to bring in a fire use management team once the fire has extended to the highest difficulty levels. And that happened here. The Forest Agency administrator, in consultation with his fire manager on the forest, decided that they needed a fire use management team for their expertise and their qualifications. They called in that team. There are specified — What if they had decided to suppress the fire? Would they still — would they need such a team? Well, the fire use management team — the use means allow the fire to burn. I see. All right. Yeah. It's — it doesn't have to do with suppression. And as far as I'm aware, there is no specific requirements with respect to individuals who suppress a fire. Not an issue in this case. But the fire use management team has specified positions, one of which is the operations sections chief. And everyone on the fire use management team has to be Type 2 qualified. And that means that they have extensive training and experience to reach that level and to be on the team.  Here, the operations section chief that reported to manage this fire was not so qualified. In fact, only trainees were in that position who, by definition, are not Type 2 qualified. There's really no dispute as to that fact here. The argument that I understand the government to be making is that even though an unqualified fire use management team came onto the fire, that doesn't necessarily mean that the fire should be suppressed. That, too, is incorrect. In each day in assessing whether the fire can continue to be managed, the agency administrator, the individual in charge of the fire, has to determine and ask himself five questions. One of those questions is whether there are — whether there's a lack of available local personnel and individuals to fill special skill positions for the fire. That's at ER 129. If he finds that there are a lack of adequate resources and skill mixes, then management should take a suppression response. Here, that's exactly what happened. But in answering those questions, the agency administrator determined or checked yes, that fire management could continue. That is not the case. Under the fire safety procedures, a fire suppression response was necessary. I understand the connection — or I need to understand the connection or your position about the connection between — assuming there was some problem here in the sense you were supposed to sign the papers and you didn't sign the papers, assuming that. How does that connect to — so something that was done with that wasn't discretionary, i.e. they were supposed to sign the papers and they didn't sign the papers. That seems somewhat unconnected to the actual decision to fight the fire or not fight the fire. Well, in deciding whether or not to fight the fire, the agency administrator has to go through five separate questions. One of those questions deals specifically with whether there are adequate skilled personnel available to fight that fire. All right, so that's a separate issue, whether he made a mistake about that. But whether he signed the piece of paper or not, I mean, how does that — if he doesn't sign the piece of paper, that means he's supposed to suppress the fire because he didn't sign the piece of paper right? I don't understand the connection. There are two separate issues. There's — one of our arguments, and we haven't gotten to this one yet, is that the agency administrator failed to assess whether conditions allowed fire management to continue each day. He claims in a declaration submitted three years after the fact that he did do this, but the actual piece of paper that he was supposed to sign off on is not in the record. This is an — Which is what I — at least I draw the conclusion that his signature is merely a matter of proof. Well — He's telling us he should, for better or — for the lawyer's benefit, have the piece of paper signed, but that doesn't stop him from being anything other than just a matter of proof. Well, we've raised this as a genuine issue of material fact, because there's no contemporary documentary evidence in the record. But he said he did. He said he did, but there are also documents in the record that show other individuals signed the very same paper that he was supposed to sign, and only he is in charge of doing this. It couldn't be more mandatory under the safety procedures. There is no way that management can continue absent the approval of the agency administrator each day. This is the management of a highly hazardous force of nature, and the safety procedures place great emphasis — great emphasis on the agency administrator each day determining that management can continue. And here we have a genuine issue of material fact as to whether that occurred. The only evidence in the record that this occurred is a declaration submitted by the person who was supposed to sign it three years later that he remembers doing it every day. And again, we have contemporary documentary — To the contrary. No, that's — Your Honor, we have documentary evidence in the record that other individuals not qualified to sign it signed it. We also have a signature by this individual on one of the days on a different sheet of paper. Did she also say, aside from I signed it, that I made the decision? Pardon me, Your Honor? I mean, the important question is whether she made the decision every day, not whether she signed it every day. Well, Your Honor, the safety procedures are very clear on this point. Yes, after the — after the fact, the agency administrator claimed to have signed the paper. But — It seems to me that the important question here is really the second prompt question. That is — and there Miller may be preclusive. I don't know. I mean, it isn't self-evident to me that the technical decision whether to deal with the fire this way or that way is a social, economic, or political — subject to a social, economic, or political policy. Yes, on a — on the gross level, i.e. — or maybe I'm talking about the implementation policy distinction. Because it's certainly the question of whether, you know, on a policy level, we're going to let some fires burn is a policy decision. But whether we're going to let a particular fire burn, I don't know if it's a policy decision. Well, it's certainly — And that's your second set of arguments. That's correct. Under the prong two analysis, our position is that, as Your Honor stated, the high-level discretionary issue here is whether or not wildland fire use is permissible in the first instance. The test, though, is an assessment of the particular actions that the government took in implementing those broad-based policy decisions. And again, here, we've identified two instances where the government did not have any policy-based determination for taking — for allowing the fire to continue to burn. The first being — and one we haven't talked about yet — is from day one, in attempting to determine whether or not to allow this fire to burn, they were supposed to do what's known as a size-up, which basically entails going out into the forest — They did eventually. I mean, not even eventually. Before there was any problem, they did it. Well, Your Honor, in initially assessing the fire, they simply didn't have the information. And this is somewhat going back to prong one, but we're on the policy side of things now in prong two. Right. And absent this information, there's no policy basis for allowing the fire to burn. It's really the implementation, and the implementation here was done incorrectly, because they have to size up the fire as specified in the safety procedures. That didn't happen here. Well, they did go there, and they did do it. I mean, but the question is, was that a decision of the kind that, according to the Supreme Court, standards are supposed to be protected, so to speak. Well, again, the decision has to be based — You're having trouble kind of moving from one — Yes. — one realm to another in terms of what we're talking about at this point. Well, again, at the high level, you're talking about the procedure, the policy decision to manage wildfire. At the implementation level, you're talking about the specific actions that the government took in attempting to implement that high-level analysis. Here, in looking at that very specific area where they did not comply, there's no — and they haven't identified a specific policy basis that was undertaken at the time. For example, in calling in the fire use management team, they have never alleged that that was based on a policy determination. They just — the government says, at this high level, we have the ability to manage for fire, and therefore, anything that we do underneath that — I think they refer to it as micro-decisions — is subsumed, is discretionary within the larger policy decision, the decision to undertake wildland fire use. So that one, there's simply — there's nothing in the record that suggests that allowing — first, bringing in an unqualified fire use management team, and then allowing that team to continue on the fire is something that is subject to a policy-based analysis. Okay. Do you want to add anything, or do you want to stay the rest of your time? I'll reserve the rest of my time, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, Sean Martin for the United States. The district court correctly concluded that this case was barred by the discretionary function to the Federal Tort Claims Act. What I'd like to do is just emphasize to the Court that this wildland fire use management is far beyond merely mandatory safety procedures, as the appellants have attempted to characterize the management strategy. Not only the Forest Service manuals, Your Honors, but the actual evidence from the fire experts and the fire managers on this particular fire established that this management was based on a variety of considerations in the first place. First of all, you had 25 lightning fires ignite on the same day in the middle of the fire season in August. I believe four of them were wilderness fires, and — Were what fires? Pardon me? I didn't hear that. Were fires in wilderness that the Forest Service decided to manage for ecosystem benefits. And keep in mind, too, Your Honors, that the Ochoco National Forest is a vast area. These fires occurred over 642,000-acre national forest. That's at ER 144. Keep in mind also that the Bridge Creek fire, the fire at issue here, remained at less than one acre in size for more than one week. And even mid-afternoon on August 16th, as we know, the fire blew up at 11 o'clock that night. The fire was still moving predictably in the Forest Service's monitoring judgment. That's at ER 85. What the record shows us is that the Forest Service managers, Your Honors, actually considered the ecological and environmental benefits to this management strategy. First of all, the national policy of the Forest Service is that for wilderness fires, that as much as you can, ensuring the natural role of fire in the ecosystem is the number one priority. That's in the Forest Service manual, Your Honor. Here, the record shows on this fire that the Forest Service was concerned about suppression as a strategy because that could involve flame retardant. And the Forest Service was specifically concerned about avoiding ground-disturbing activities and applying retardant to streamcourses because that could affect downhill, downstream the city of Mitchell's water supply. And that's the consideration. Sotomayor, you can step back for a minute and ask a question. I mean, this is sort of off-point, but it's just been bothering me. What? If I understand that this was, you know, judgments were made, but the net result was that a couple thousand acres of private timber burned up, right? Yes. Is there no ‑‑ I mean, so the Federal ‑‑ the fact remains that the net result of all this was that, you know, whether one looks at it as a wise decision or an unwise decision, and let's assume it was even purposeful. They said, well, if we do this, 2,000 acres of private timber will burn up, but that's for the greater good. There's no remedy for the private people who are essentially financing the public good at that point? Well, if they have insurance coverage, I would think that might cover that. Yeah, but the government can just do that. Well, it certainly depends on the situation. Is that a taking? Pardon me? Why wouldn't it be a taking? It ‑‑ well, that, you know, I really couldn't speak to that. I mean, I suppose it could be, Your Honor, depending on the circumstances. That's what ultimately happened here. Ultimately, I mean, let's assume ‑‑ I mean, presumably the government really didn't think this was going to happen. But suppose they did think it was going to happen. They said, nonetheless, it's still for the greater good to have this happen. Right. And keep in mind, Your Honor, too, that the Forest Service until really late in the day on the 16th of August, you know, looked at all these factors every day and, you know, said, gosh, we have a quarter acre fire, one acre fire. But your ultimate position is that even if they didn't do that, even if they decided we're going to burn those acres up because it's a good idea, that would still not come under the Federal Tort Claims Act or anything else, I guess. Well, I don't think the ‑‑ I think the Forest Service might be on shakier ground, Your Honor, if it decided to go ahead and ‑‑ But not conceptually, as I understand the way the Federal Tort Claims Act works. Well, the Federal Tort Claims Act does have, you know, a bar to the waiver of sovereign immunity for, you know, discretionary function. And here, Your Honor, I guess all I'm trying to say is that under these facts, right, and given the fact that of Miller and the fact that you have here a multiple fire situation and you have a strategy, wildland fire use, that the Forest Service recognizes is equal to suppression in terms of it being complicated management strategy and an emergency precedent per se, but as I think the district judges below, the magistrate and the district judge, recognize that there really isn't a meaningful difference between the type of fire management at issue in Miller and this similar emergency multi‑fire management by the Forest Service. And I mentioned that the Forest Service equates the two strategies, and you can see that in the very introduction to the wildland fire use guidelines, the interagency guidelines, that says ER 120. I can certainly focus on the three very specific technical arguments that the appellants have brought. Well, of those, the only one to me that possibly has any feet is the staffing question. But I gather that before the fire blew up, there was appropriate staffing. Is that right? Yes. Yes, that's right. By 1400 hours on August 16th, which was about approximately eight hours before the fire blew the perimeter, the fully trained operations section chief had arrived at the incident command post. That's in the record before this court. So the Presumably this requirement exists for a reason. And the fact that it wasn't followed, you know, we don't know whether it influenced anything or not, but it does, I mean, obviously, I suppose they would eventually have to be able to tie the events to not following that aspect, the nondiscretionary aspect, i.e., not having an appropriate staff. But suppose they could do that somehow. Yeah. Well, I'll make a few points about that, Your Honor. The first is that I think it's notable that in the complaint, which is in the supplemental excerpts of record, the complaint for this whole case, that the plaintiffs made very specific allegations about where the Forest Service was negligent and what the problem was, and that the Forest Service had to start suppression, basically from the very beginning of this fire. But nowhere in the complaint is there any specification or identification about the staffing of the fire use management team or an allegation that when you have one line member of a 16-member team with a commander that's reporting up to the agency administrator, Mr. Walter or Mr. Queen, that, you know, having one trainee out of 16 as a line member, that that is going to rewrite the entire strategy. I think it's also really important, Your Honor, to keep in mind that the Forest Service had discretion about whether to even order the fire use management team. ER 137 establishes that the Forest Service, quote, can order a formal management team, you know, as it did here. So the Forest Service would have been well within its discretion to simply go ahead and manage this fire without even ordering a team at all. So it would certainly seems unfair to punish the Forest Service and to say something is nondiscretionary at all when, in fact, ordering the team or not is discretionary in the first place. And as the district court noted, Your Honor, nor does the Wildland Fire Use strategy indicate or mandate that if you have a team that's ordered, an outside team that's ordered and it arrives with a trainee, that the whole strategy has to be dropped. That's another major problem in this whole argument. And I would refer, Your Honor, to the Kennewick decision from this Court, which points out that a requirement must be specific and mandatory. So here, there's simply no management requirement or Wildland Fire Use strategy requirement that if a single line member of an outside team comes in as a trainee, that the strategy has to be shifted to suppression. So it would be helpful to – I understand that this is a point on which Miller may, in fact, be preclusive, but it would be helpful to me for you to explain the second problem, why these sort of natural management issues are social, political, or economic policy. I understand they're policy, but why are they social, political, or economic policy? Miller said how you fight a fire fits that. I don't understand why. And I wonder about this. Yeah. Well, you know, that's right. Miller looked to those national manuals, right, and said, well, fighting a fire implicates these sort of global concerns, right? And it seemed that Miller relied on those sort of national-level pronouncements. But the Supreme Court presumably meant to separate out certain kinds of policy decisions from others. And it would seem to me that how you fight a fire, you know, how you suppress a fire is a technical, scientific thing. But I don't know why it's a policy question. Well, it's very unpredictable, Judge. Sorry? It's unpredictable. You know, fighting a fire is predictable, but it's not unpredictable in a social, political, or economic fashion. Well, it is in a way, Your Honor, because there's, you know, there's certainly limited resources. There's vast areas. There's expertise in predicting risks of how a fire is going to spread. And, you know, I certainly recognize, Judge, you're concerned. I understand there's expertise, but there's a carve-out for political, for professional expertise. And that's what I think we're dealing with here. I mean, similarly, if the question is, you know, a prediction as to whether or not this fire is going to jump the boundary, that seems like a professional matter. Right. Right. Well, there's more than just that, I think, Your Honor. What I think the evidence, the declarations from the various members of the fire team here, Mr. Walter, Mr. Queen, Mr. Letts, Mr. Reedy, those were all higher-level fire experts and managers who met and discussed this fire every day, and they balanced those different declarations to show how... But as I understand their situation, they have already been told, basically, let the fire burn unless it's going to endanger something. Is that not basically what they've been told? Well, it's — I think it's a little more than that, Judge. I think it's let it — let the fire burn naturally because that has ecological benefits, right, for the wilderness, right, and it has ecological benefits for the city of Mitchell. But that decision's been made above them, i.e., let the fire burn. I mean, because there are — the higher-level decision is because of the ecological benefits and so on, we're going to let fires burn in wilderness areas unless there's essentially a danger from doing so. Right. And here, you know, it was a little more... It's a higher-level of making a decision of, you know, not as — not in general let fires burn as opposed to suppress them, but is there a danger here if we let it burn? Certainly. The Forest Service recognized there was a danger, but what it did in some of those charts you see in the record is it made a judgment call about the extent of those risks. Exactly. And that's why I'm wondering what were those judgment calls, why those are policy decisions of the kind covered by the statute. Well, because each day judged the decision to proceed with the wildland fire use management. I understand that. But what were they thinking about? Were they thinking about the overall fact that it's a good thing to let fires burn, or were they thinking, is this fire going to cause a problem if we let it burn, which is an on-the-ground scientific, professional decision? I think it was a combination of all of that, Judge. Certainly, the Forest Service was very concerned about the specific conditions of this wilderness, that it had been suppressed for so many decades that it was overloaded and was concerned about a... The Forest Service, yes, but the people on the ground, what was their job? Well, their job, and I think the declarations show, Your Honor, is that they believed that given the slope aspect, given the elevation, given the prevailing winds, given the specific fire scar from a previous... Exactly. All of those are scientific questions. They are not policy questions about the social, political, or economic determination. That's what's bothering me. Well, there's certainly scientific opinions based on ground knowledge, but those aren't, those don't drive the analysis. Those factored in. I think those characteristics of this fire, Your Honor, established that the risk of this fire burning more than a mile in the opposite direction of where it was expected to burn established what they believed was a low risk of economic damage. The point that I'm trying to make is those were the kinds of considerations that were being made at that time in that place by those people, not the larger policy decision of whether to, in general, let fires burn or even at that point whether to let this fire burn originally. The question is, if we keep letting it burn, is there going to be a risk, and why is that a policy decision of the kind that is within the discretionary function? That's what I want to know. Because it's not, I don't think it's a preordained decision, Your Honor. I think the Forest Service looked at the values at risk, looked at the extent of the risk to those values, private property, cultural resources on forests. What they're making the decision based on is the game worth the candle, is the risk that we have here, and we can assess it. But the question is, as a matter of policy, do we accept the risk or do we not accept the risk? Isn't that the policy consideration? I think that's certainly a part of it. But there are those five questions in this wildland fire use management scheme. And, you know, on each day, the fire manager went through each of those elements, right, and made a determination, does it meet this value? And I believe the fifth factor, Your Honor, is basically sort of a catchall. The fifth factor in the decision criteria is whether there are other factors, a catchall other than the first four factors that should be considered as a matter of discretion, you know, by the fire manager, Mr. Walter and Mr. Queen here. So it's this strategy really sort of breeds discretion at every pore. And certainly I think fire management involves safety as well. I think the magistrate's opinion here pointed out that, at least on the 16th, it would not have been safe perhaps to even attempt to suppress that fire once it started blowing up, although it was still within the wildland fire use parameter. So, you know, it wasn't simply expert decision about where it is and the low value of risk on the economic values on the private landowners. There's also safety considerations and national policy considerations. Can you just tell me? Well, I'll find it. I just want to look at that list of factors, but I'll find it. I think I'll find it faster if I just look myself. So go ahead. If you look at SCR 159, Your Honor, that's the decision criteria checklist. That was, for example, signed in this particular iteration by Mr. Walter on the 8th, which talks about, you know, makes a decision. And this is Mr. Walter after discussing with his team, is there a threat to life property or resources that cannot be mitigated? Two, are potential effects on cultural and natural resources outside the range of acceptable effects? Three, are relative risk indicators and are risk assessment results unacceptable to the appropriate agency administrator, a judgment call, unacceptable to the administrator? Four, is there other proximate fire activity that limits or precludes successful management of this fire? And, you know, that's an analysis of whether fire activity establishes to the agency administrator's satisfaction that the staffing is adequate or not to continue with that strategy. So there's almost like a human resources element to the fourth decision criteria here is do we have the staffing in light of where the fire is and what the activity is to keep managing this fire effectively for wildland fire use? And then the fifth criterion is are there other agency administrator issues that preclude wildland fire use? And that's that catchall, Judge Brezon, that I was mentioning a few minutes ago. Just other factors that are on the radar of Mr. Walter, who with his team oversaw this entire fire strategy that he believed had bearing about whether it was wise use of discretion or not to continue with that overall strategy. Unless the panel has further questions, the United States submits. Thank you very much. Thank you. We have some time left. A few points of rebuttal. First, with respect to the five factors that we were just discussing on the decision criteria checklist, a yes as to any one of those factors indicates that a suppression response is in order. So if there's a residual catchall, that may well be, but that doesn't mean that Mr. Walter shouldn't have stopped the fire, given the lack of a qualified fire use management team. The court also noted that the discretionary function exception is essentially swallowing the Federal Tort Claims Act. The point of the act is to hold the government liable to the same extent as a private party in the same circumstances. And here private land managers undertake fire use management all the time to take care of brush and undergrowth. If that escapes, they're liable under Oregon law, and in fact the federal government is extremely aggressive in going after private parties when fire escapes from private land onto national forests. So there's a real double standard here. We talked a bit about Miller, but the specifically relevant case here is Bear Medicine, and that's a case that involved the government's oversight of a dangerous logging operation on the forest. And the court found that the failure of the government to provide proper oversight of safety procedures at this inherently dangerous site was not a policy decision. It's directly analogous to what happened here. Although they may have discretion at the broad level in implementing the fire, just as implementing the logging situation, the government was obligated to make sure that the safety procedures were followed. They didn't do it in either case. Miller is much different in that the court found where the agency is forced to manage multiple fires with limited resources, that discretion applies. That's not what we have here. We have very specific mandatory safety procedures that we allege, if you focus on the very actions we allege, were not followed and resulted in harm to the appellants. In fact, if the plan's not followed, suppression is mandatory. The only way they can operate and manage fire is pursuant to a plan, and that's demonstrated in this case by the fact that the Ochoco National Forest, for 13 years prior to their attempt to manage this fire, had no authority to manage a fire. Because they didn't have a plan in place, every fire on that forest was suppressed for 13 years. Only once the plan was put in place, two weeks before they tried to manage this fire, did they have the authority to go forward. So absent compliance with the plan, suppression is the only other option. There's two options, suppress it or manage it. And here they attempted to manage it, but you can only do that pursuant to the plan. Otherwise, you have no authority, which is what happened for 13 years absent a plan. Here they didn't comply with the plan, therefore they lacked authority and suppression was a necessary response, the only response. I think Your Honor has hit something right on point with respect to the use of scientific or professional judgment. These are not policy considerations of the type that, on a national level, should we have fire management or not? Policy decision. Should we use a qualified fire use management team or not, or suppress? Not a policy decision. That's just a matter of professional judgment on the ground. Is your opponent correct that it wasn't mandatory to have the team at all? Pardon me, Your Honor? Is your opponent correct that it was not mandatory to have the team at all? No. Well, I understand his point. It was optional to call in the team. Yes. But once the fire activity reached to the highest level, they could call in the team, and the responsible forest supervisor and his fire chief on the forest both determined that it was necessary to have a fire use management team. So they called in the team, but once they do that, the specifications for the team are very, very specific. And again, the reason for that is you've got a fire that is at the highest difficulty level. They call in a team because they can't handle it anymore. But then to put it in the hands of a team that lacks qualified personnel and, in fact, has trainees in the key position, and the operations section chief is not just any position. This individual is responsible for designing and implementing fire management procedures. And, again, that's exactly the problem that we had here. There's evidence in the record that there were concerns that the fire was going to blow up by the 14th, yet they allowed this team to manage it during those intervening critical two days. Mr. Martin suggested that a qualified individual did eventually show up on the scene. Can I ask a question? What ultimately does your complaint allege about negligence? What was negligence here? Well, I understand that's not the question before us, but it seems, I mean, in the end, it doesn't seem you're going to be able to prove a negligence case based on the fact that you had a trainee person. I mean, presumably you have to identify some actual on-the-ground negligence here. Well, Your Honor is correct. That is not the issue before the court, and I believe that would be I know, but there must be an allegation in your complaint. What is it? Well, that they, that their mismanagement of the fire directly resulted in the damage to our funds. They misjudged the risk. They shouldn't have. They should have been fighting this fire because they should have known it was going to blow up or something? Well, that's part of it, Your Honor, and it's in our briefs as well. I mean, the district court issued a decision based on summary judgment. So there was extensive argument beyond that. I understand that. I just want to know. It's a very simple question. Okay. What is the allegation of what the negligence was? Well, in fighting or in trying to fight the fire with an unqualified management team, they lost control of it. They shouldn't have done that. That was a negligent decision. I mean, obviously negligence isn't the issue at this point. It would be a matter of State law, I believe. I see. Approximate causation is not the discretionary function exception is a jurisdictional question. It's not the ultimate decision of whether or not the actions alleged caused harm. It's whether or not the actions alleged provide jurisdiction or not. Okay. Thank you very much. Thank you, Your Honor. The case of Woodward-Steckert v. United States is submitted. We thank you both for your arguments, which were helpful. And we are in recess. Thank you very much. All rise.
judges: Berzon, Watford, Walter